# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In re:                                    Case No. 12-80560-DHW
                                          Chapter 7
TONY LYLE HIETT,

      Debtor.

_____

RES GA TWO, LLC,

      Plaintiff,

v.                                        Adv. Proc. 12-08029-DHW

TONY LYLE HIETT,

      Defendant.

## MEMORANDUM OPINION

Before the court is Res Ga Two, LLC's (hereinafter "Plaintiff") complaint to determine the dischargeability of the debt owed to it by Tony L. Hiett (hereinafter "Hiett" or "Defendant") pursuant to 11 U.S.C. § 523(a)(2)(B)(false financial statement) and to deny Hiett a discharge in general pursuant to 11 U.S.C. § 727(a)(2)(A)(transfer or concealment of the debtor's property prior to bankruptcy). Trial was held on April 10, 2014. At trial, the plaintiff was represented by its counsel Joel Connally and the defendant was represented by his attorney, Charles M. Ingrum, Jr.

Upon consideration of the facts, the law, and the respective briefs of counsel, the court, for the reasons set out herein, finds for the defendant on the count under § 523(a)(2)(B) and for the plaintiff on the count under § 727(a)(2)(A).

## Jurisdiction

The court's jurisdiction in this dispute is derived from 28 U.S.C. § 1334 and from an order of The United States District Court for this district wherein that court's jurisdiction in title 11 matters was referred to the Bankruptcy Court. *See* General Order of Reference [of] Bankruptcy Matters (M.D. Ala. April 25, 1985). Further, because this dispute requires a determination of the dischargeability of a particular debt and of discharge in general, this is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and (J) thereby extending this court's jurisdiction to entry of a final order or judgment.

## Preliminary Matter-Statute of Limitations

Plaintiff began this adversary proceeding by filing an original complaint on December 15, 2012, and thereafter amending the complaint on July 26, 2013. Hiett filed an answer to the amended complaint on January 15, 2014, and there, for the first time, raised generally the defense that the complaint was time barred.[1] Then, on the day of trial, Hiett moved for dismissal of both counts of the complaint contending that they were time barred. A brief history of this proceeding will be of help in understanding this issue.

Hiett filed his chapter 7 bankruptcy petition for relief in this court on April 17, 2012. The date first set for the § 341 meeting of creditors was June 7, 2012. Pursuant to F.R.B.P. 4004(a) and 4007(c), the last date for filing objections to discharge or to challenge dischargeability of a particular debt was 60 days after the first date set for the meeting of creditors, or August 6, 2012.

The creditors' meeting was not completed on June 7, 2012. Instead, the meeting was continued from time to time, until it was finally concluded on October 25, 2012.[2] On that same day, October 25, a stipulated order entered

---

[1]In the answer to the amended complaint, Heitt raised a host of other defenses that were plead generally without further prosecution with supporting facts. For example, along with the statute of limitations defense, Hiett plead generally accord and satisfaction, contributory negligence, estoppel, failure to mitigate, *res judicata*, and waiver. None of these defenses were more particularly litigated through a motion to dismiss or otherwise.

[2]Plaintiff asserts that the creditors' meeting was continued several times as a result of the Hiett's failure to produce records and to provide information required by the trustee.

extending the deadline for filing complaints objecting to discharge to sixty days following the completion of the creditors' meeting (Case No. 12-80560-DHW, Doc. #25).

With regard to the § 523 count of the complaint, Hiett correctly notes that extensions of complaint deadlines are controlled by F.R.B.P. 4007(c). The rule provides:

> **(c) Time for Filing Complaint Under § 523(c) in a Chapter 7 Liquidation, Chapter 11 Reorganization, Chapter 12 Family Farmer's Debt Adjustment Case, or Chapter 13 Individual's Debt Adjustment Case; Notice of Time Fixed.**
> Except as otherwise provided in subdivision (d), a complaint to determine the dischargeability of a debt under § 523(c) shall be filed no later than 60 days after the first date set for the meeting of creditors under § 341(a). The court shall give all creditors no less than 30 days' notice of the time so fixed in the manner provided in Rule 2002. On motion of a party in interest, after hearing on notice, the court may for cause extend the time fixed under this subdivision. **The motion shall be filed before the time has expired.**

F.R.B.P. 4007(c)(Emphasis added).

Concerning objections to discharge under § 727, Hiett, again, correctly observes that extensions of complaint deadlines are controlled by F.R.B.P. 4004. The rule in relevant part provides:

> **(a) Time for Objecting to Discharge; Notice of Time Fixed.**
> In a chapter 7 case, a complaint, or motion under § 727(a)(8) or (a)(9) of the Code, objecting to the debtor's discharge shall be filed no later than 60 days after the first date set for the meeting of creditors under § 341(a)............
>
> **(b) Extension of Time.**
> (1) On motion of any party in interest, after notice and hearing, the court may for cause extend the time to object to discharge. Except as provided in subdivision (b)(2), **the motion shall be filed before the time has expired.**

(2) A motion to extend the time to object to discharge may be filed after the time for objection has expired and before discharge is granted if (A) the objection is based on facts that, if learned after the discharge, would provide a basis for revocation under § 727(d) of the Code, and (B) the movant did not have knowledge of those facts in time to permit an objection. The motion shall be filed promptly after the movant discovers the facts on which the objection is based.

F.R.B.P. 4004(a) and (b)(Emphasis added).

Hiett argues that the plaintiff did not file a motion prior to the August 6, 2012 complaint deadline seeking an extension of time to file either a § 523 or a § 727 complaint. Further, Hiett contends that there are no facts to show that such motion was timely under F.R.B.P. 4004(b)(2); that is, facts learned after the deadline passed but before entry of discharge which would form the basis of revocation of discharge. Hence, Hiett moves to dismiss both counts on these statute of limitations grounds.

The law in this circuit is clear. The deadlines for filing § 523 and § 727 complaints have been held to be mandatory with the court lacking discretion to extend the deadlines by granting a late filed motion. *In re Alton*, 837 F.2d 457 (11th Cir. 1988); *Alabama Department of Economic and Community Affairs v. Lett*, 368 Fed. Appx. 975 (11th Cir. 2010)(both cases addressing F.R.B.P. 4007( c)); F.R.B.P. 9006(b)(3)(limiting extensions of time to file § 523 and § 727 complaints to the strictures of Rules 4004(c) and 4004).

Yet, that rule of law is distinguishable in the case *sub judice*. In the Circuit authority cited above, the issue was whether the court could extend the complaint deadline by granting a late filed motion to do so. Here, however, it was the debtor, not the court, that stipulated to the deadline extension thereby waiving his right to enforce the earlier deadline.

In order to establish a waiver, it must be shown that 1) there existed a right, privilege, advantage, or benefit capable of being waived, 2) there was actual or constructive knowledge thereof, and 3) there was the intent to relinquish that right or privilege. *Matter of Garfinkle*, 672 F.2d 1340, 1347 (11th Cir. 1982). "Waiver is usually a question of fact since it concerns the intent of the parties." *Id.* at 1348. Here, by agreeing to an extension of time

for plaintiff to file a complaint, what other intent could Hiett have had but to do just that?  The court can imagine no other, particularly in light of the fact that Hiett was represented by counsel.

For these reasons, Hiett's motion to dismiss on statute of limitations grounds is not well taken and will be denied.

## Findings of Fact

The § 523(a)(2)(B) Count:

On January 11, 2006, Hiett entered into a loan agreement with First Bank of Henry County (hereinafter "First Bank").  Under the agreement, he personally guaranteed the loan of $2,527,000 for Hiett Homes and Developments, Inc. (Tr. 15, April 10, 2014; Plaintiff Ex. 4.)  In order to obtain the loan, Hiett submitted a Personal Financial Statement to First Bank dated January 4, 2006.  (Tr. 16, April 10, 2014.)  The personal financial statement contained information such as assets, liabilities, cash on hand, accounts receivable, and any assets and liabilities associated with corporate entities in which the Hiett had an interest.  (Tr. 20, April 10, 2014.)

Ron Willard, the loan officer at First Bank who worked on the Hiett loan, used Hiett's personal financial statement, as well as other information provided by Hiett, to compile a personal financial analysis. (Tr. 20, April 10, 2014.)  Mr. Willard then presented a loan package to a loan committee in order to have the loan approved.  The loan package included the personal financial statement, the personal financial analysis, and a credit memo.  (Tr. 22, April 10, 2014; Defense Ex. 24 page 17.)

When the loan committee considered whether to approve a loan, it relied upon the personal financial statement, the personal financial analysis, the overall financial wherewithal of the individual guaranteeing the loan, the business entity borrowing the money (including how long it had actually been formed and in business), the financial information for the business, the liquidity of the underlying collateral, the values of the collateral, the borrower's ability to pay, the payment record of the past, and the borrower's history and relationship with the bank. (Tr. 45, April 10, 2014; Defense Ex. 24 page 19.) However, the main consideration of the committee was the overall banking relationship with the borrower.  (Tr. 50, April 10, 2014; Defense Ex. 24 page 19.)

Hiett did not personally furnish his personal financial statement to First Bank. (Tr. 53, 60, April 10, 2014.) Instead, that statement was given to the bank by Spectrum Financial (hereinafter "Spectrum"). Spectrum, a loan broker, would seek out development projects for builders and developers and then would find lenders in order to help the builders and developers finance the projects. (Tr. 135-36, April 10, 2014.) Hiett did a lot of business through Spectrum, and they kept his personal financial statement on file and would often furnish it to lenders on his behalf. (Tr. 61, 136, April 10, 2014.) Hiett would only update the personal financial statement with Spectrum once or twice a year. (Tr. 126-37, April 10, 2014.) Hiett does not specifically recall the personal financial statement that was used to obtain the loan from First Bank, however, he did acknowledge that it bore his signature. (Tr. 61, April 10, 2014.)

The plaintiff points to three misrepresentations by the debtor in the personal financial statement that was given to First Bank. The first misrepresentation concerned the amount of cash on hand that Hiett actually had as opposed to the amount that was listed on the statement. The personal financial statement indicated that he had $571,000 cash on hand in three separate bank accounts, the first account was at First Bank with a balance of $395,000; and the other two accounts were at Heritage Bank with a balance of $114,000 and United Bank with a balance of $62,000. (Tr. 16-17, April 10, 2014; Plaintiff Ex. 1.) However, the account at Heritage Bank, according to the January 11, 2006 statement, had a balance of -$1,356.78 and the United Bank account had a balance of $3,116.56, according to the bank statement dated January 10, 2006. (Tr. 62-64, April 10, 2014; Plaintiff Ex. 5 & 6.) In addition, Hiett's total cash on hand in both personal and corporate accounts at First Bank was $450,000. (Tr. 16-17,26, April 10, 2014; Defense Ex. 24 page 19.) As a result, Hiett's financial statement overstated the amount he had on deposit by approximately $120,000.

The second misrepresentation alleged by the plaintiff is related to the accounts receivable owed to Hiett and listed on the personal financial statement. The financial statement lists two of the accounts receivable as owed from Chris Hill for $141,000 and from Greg Wallace for $20,000. Both Hill and Wallace were long-time employees of Hiett. (Tr. 65-67, April 10, 2014.) The agreement on the loan to Chris Hill was not signed until February 14, 2006, which was after the date of the loan from First Bank. Hiett testified that he had loaned the money to Chris Hill over the years, but eventually had

to ask for collateral due to the amount of the loan. Thus, the loan was in effect when the personal financial statement was signed even though it was not subject to the written security agreement until after that date. (Tr. 141, April 10, 2014.) Although these debts were never collected, Hiett testified that as of the date of the personal financial statement, both of the loans were due, and he felt that they were collectible. (Tr. 65-67, April 10, 2014.) The court has no evidence to the contrary.

The third misrepresentation alleged by the plaintiff is Hiett's omission of his interest in other corporate entities and his contingent liabilities associated with those entities. The companies not listed on his financial statement were Auto Locate, Inc., Hiett Enterprises, Liquidation Operation, and Classic Construction.

Hiett's testimony, which was not contradicted by other evidence, was that Auto Locate, Inc., Hiett Enterprises, and Liquidation Operation had no debts, hence the omission of those three entities would not have negatively impacted his personal financial statement. (Tr. 183-85, April 10, 2014.) However, Classic Construction's 2006 tax return shows that the company had over $1.4 million in liabilities at the end of 2006. According to Hiett, some but not all of these liabilities were owed at the beginning of 2006, when the personal financial statement was given to First Bank. There is no supporting documentation to show the exact liability of Classic Construction at that time. Hiett also stated that Classic Construction had $420,000 in cash that was also not listed on the personal financial statement. (Tr. 188, April 10, 2014; Defense Ex. 6.) Without the supporting documentation, the worst-case scenario is that Hiett may have been liable for another $1 million owed through Classic Construction that was not stated on the personal financial statement. A mitigating factor is that Classic Construction was another separate guarantor on the loan from First Bank. (Tr. 185, April 10, 2014; Plaintiff Ex. 3.) Hence, First Bank would have been aware otherwise of Hiett's interest in Classic Construction.

Three officers from First Bank testified at trial or their depositions were admitted into the evidence. Ron Willard was the bank's loan officer. He testified that he relied on Hiett for the information in the personal financial statement and that it was material to the loan application process for the bank to know of any businesses in which Hiett had an interest. (Tr. 16, 18-19, April 10, 2014.) He also indicated that at the time the loan was made, the bank

used a fast track approval method for these types of commercial loans, and that even if he had the correct account balances for the cash on hand, he would still have recommended the loan to the committee. (Tr. 35-36, April 10, 2014.) Thad Williams was a member of the loan committee and testified that he still would have voted to approve the loan even if Hiett had not had the accounts at Heritage Bank and United Bank. (Tr. 52-53, April 10, 2014.) Larry Phillips was another member of the loan committee and at his deposition he indicated that the committee understood that the personal financial statement was a generalized statement for a relevant period rather than a specific statement for an exact date because they understood that the cash flow situation could change. (Defense Ex. 24 pages 18-19.) He said that he would have approved the Hiett loan based upon Hiett's prior relationship with First Bank. Phillips acknowledged that all of Hiett's notes had been paid on time. In essence, the funds deposited outside First Bank were of no consequence. (Tr. 18, 20, April 11, 2014.)

The 727(a)(2)(A) Count:

Facts Related to Concealment of Assets:

When Hiett Homes and Developments, Inc. failed, the Hietts moved to Florida to pursue a business opportunity. (Tr. 78-79, April 10, 2014.) Around that time, Hiett was in default on the loan from First Bank, and the bank swept over $100,000 from his personal account. (Tr. 79-80, April 10, 2014.) When the business opportunity in Florida did not work out, the Hietts moved to Auburn, AL in 2009. (Tr. 79, April 10, 2014.)

In the fall of 2009, Hiett formed five Alabama companies.[3] (Tr. 81-84, April 10, 2014.) The two companies at issue here are Hiett Automotive, Inc. (hereinafter "Hiett Automotive Alabama") and Hiett Holdings, Inc. (hereinafter "Hiett Holdings"). Hiett filed the paperwork to form these corporations himself. Initially, he set both of them up with Kelly Hiett, his wife, as the sole shareholder and himself as the manager. (Tr. 82, 84-85, 151-52, 154, April 10, 2014.) Kelly Hiett did not invest any personal assets or capital into the companies. (Tr. 82, 84, 194, April 10, 2014; Tr. 5-6, April 11, 2014.) Hiett has never been a shareholder in either company. He also never loaned

---

[3] The companies were Hiett Automotive, Inc., Hiett Enterprises, Inc., Hiett's Trading Co., Hiett Developments, Inc. , and Hiett Holdings, Inc.

money or contributed assets or capital to either company. (Tr. 152, 179, April 10, 2014.)

Hiett Holdings was formed for the purpose of acquiring other corporations when business opportunities presented in the future. Over time, it became a consultant and a broker, buying and selling products other than vehicles. (Tr. 85, April 10, 2014.) Kelly Hiett was initially the sole shareholder in Hiett Holdings. On May 10, 2010 she transferred all of her shares to Lanny R. Hiett, Sr. (hereinafter "Rex Hiett") in exchange for his financial help with the company.[4] (Tr. 7, April 11, 2014.)

Hiett Automotive Alabama began operations in May or June of 2010, and at that time it began buying and selling vehicles. (Tr. 87-88, April 10, 2014.) Kelly Hiett was initially the sole shareholder in Hiett Automotive Alabama. On May 10, 2010 she transferred all of her shares to Rex Hiett in exchange for his financial help with the company. (Tr. 7, April 11, 2014; Defense Ex. 9.)

When Kelly Hiett transferred her shares in Hiett Automotive Alabama and Hiett Holdings to Rex Hiett, he did not pay her for the stock. Instead, he invested in the companies in order to help them get started up. (Tr. 127, 203-04, April 10, 2014.) Rex Hiett took out two loans to be used to help either company as needed. He also assisted in getting a floor plan deal so that Hiett Automotive Alabama could purchase inventory. (Tr. 128-29, 202-04, April 10, 2014.) Rex Hiett obtained the Alabama dealer's license under which Hiett operates Hiett Automotive Alabama. (Tr. 157-58, April 10, 2014.) Rex Hiett is the record owner of Hiett Automotive Alabama and his name is on the bond and insurance for the company. (Tr. 21-22, 24, April 11, 2014.)

Rex Hiett does not actively participate in the operation of either Hiett Automotive Alabama or Hiett Holdings. (Tr. 121, 159-60, April 10, 2014.) Pursuant to the shareholder agreements, Rex Hiett does not receive any of the profit from the corporations. Any profit is reinvested in the corporations as additional capital. (Tr. 156-57, April 10, 2014; Defense Ex. 10 & 11.) Rex Hiett will also make deposits into the companies as needed to help out. (Tr. 124-26, April 10, 2014.)

Hiett takes care of the day-to-day operations and financial records and ledgers of both Hiett Automotive Alabama and Hiett Holdings. (Tr. 176-78,

---

[4] Rex Hiett is Tony Hiett's father.

April 10, 2014.) Hiett is the only one who has signatory authority on the accounts for Hiett Automotive Alabama and Hiett Holdings. (Tr. 97-98, April 10, 2014.) Kelly Hiett occasionally helps run errands for the businesses but does not actively participate in the day-to-day operations of either company. (Tr. 6, April 11, 2014.)

Tony Hiett testified that when the Hietts first moved to Alabama, he attempted to get a personal checking account, but was turned down. (Tr. 86, 152, April 10, 2014.) Kelly Hiett has not attempted to get a personal banking account since the Hietts' move to Alabama. (Tr. 14, April 11, 2014.) Neither of the Hietts currently have a personal bank account of any kind. (Tr. 92, 102, April 10, 2014; Tr. 5, April 11, 2014.) Neither of the Hietts have ever taken a salary from either Hiett Automotive Alabama or Hiett Holdings. (Tr. 98, April 10, 2014: Tr. 12-13, April 11, 2014.) Hiett does occasionally pay himself "very little" money from the accounts of the two companies. (Tr. 98, April 10, 2014.)

Both of the Hietts use the debit cards from the Hiett Holdings account or the Hiett Automotive Alabama account to make personal purchases for their family. They also use the companies' accounts to pay their personal expenses. (Tr. 115-17, 131-33 April 10, 2014; Tr. 13-14, April 11, 2014.) Hiett has a current $3 million life insurance policy that is paid for by Hiett Automotive Alabama. (Tr. 194-95, April 10, 2014.)

Hiett accounts to his CPA for the personal expenses paid out of the accounts and they are listed in the corporate tax return as commissions. (Tr. 179-80, April 10, 2014.) Hiett testified that he knows that keeping the money in corporate rather than personal accounts prevents creditors from being able to access the money. (Tr. 86, 192-93, April 10, 2014.)

On November 24, 2010, the plaintiff sued Hiett in Georgia state court and received a default judgment on May 24, 2011. (Tr. 197, April 10, 2014.) The plaintiff sent Hiett a post-judgment discovery request on January 12, 2012. (Tr. 112, April 10, 2014.) The plaintiff also served Hiett Automotive Alabama with post-judgment garnishments, but Hiett responded that Hiett Automotive Alabama was not holding any personal money for him. (Tr. 193, April 10, 2014.)

Facts Related to Transfer of Assets:

Hiett formed Hiett Automotive, Inc. in Georgia (hereinafter, "Hiett Automotive Georgia") at the end of 2006 and began buying and selling cars in 2007. (Tr. 77-78, April 10, 2014.) When the Hietts moved to Auburn, he

was still running Hiett Automotive Georgia.  He wrapped up Hiett Automotive Georgia at the end of 2009. (Tr. 80-82, 153, April 10, 2014.)

When Hiett Automotive Georgia was dissolved, it had few remaining assets.  Both Hiett and Kelly Hiett testified that no money or inventory was ever transferred from Hiett Automotive Georgia to Hiett Automotive Alabama. (Tr. 82, 88-91, 153, 179, April 10, 2014; Tr. 10, April 11, 2014.)  The 2009 final tax return for Hiett Automotive Georgia shows that there was no remaining inventory in the company.   (Tr. 215, 224-25, April 10, 2014; Defense Ex. 20.)  Schedule D of the Hietts personal 2009 return shows that Hiett Automotive Georgia was dissolved without any proceeds from sale of stock or transfer of assets.  (Tr. 214-15, April 10, 2014; Defense Ex. 19.)

Customers from both of the companies would often write a check to Hiett personally rather than to the company.  When Hiett receives such a check, he deposits it into the appropriate company account.  (Tr. 94-95, 98-102, 161-168, April 10, 2014; Plaintiff Ex. 7, 9, 10, 11, 13, 14, 15, 16, 18, 19, 20, 21, 23.) In particular, Hiett received several checks as down payments for vehicles that were written to him.  He deposited all of the checks into the Hiett Automotive Alabama account.  (Tr. 98-99, April 10, 2014; Plaintiff Ex. 11, 12, 13, 14, 15, 16.) Additionally, Hiett would withdraw cash as needed from the Hiett Automotive Alabama account in order to purchase vehicles.  (Tr. 101-102, 175, April 10, 2014; Plaintiff Ex. 22.)

Hiett also did business with a few Atlanta jewelry companies. Chaplin's, one of those jewelry companies, wrote him a check for $2,850 which was dated after the date of his petition.  Hiett testified that this check was for a couple pieces of jewelry that Chaplin's bought from Hiett Holdings.  Hiett Holdings had purchased the jewelry from a customer and then re-sold it to Chaplin's.  Hiett deposited the check into the Hiett Holdings account. (Tr. 94-95, April 10, 2014; Plaintiff Ex. 7.) There were several other similar transactions and checks admitted into evidence concerning both of the companies. (Plaintiff Ex. 7, 9, 10, 11, 13, 14, 15, 16, 18, 19, 20, 21, 23.)

## Conclusions of Law

The § 523(a)(2)(B) Count:

Plaintiff contends that the debt owed it by Hiett should not be discharged because of Hiett's giving of a fraudulently false  financial statement.  The relevant statute and case law controlling the dischargeability of such a debt follows.

A debt obtained by fraud is not dischargeable in bankruptcy. The statute provides in relevant part:

>  (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . .

>>  (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by . . .

>>  (B) use of a statement in writing —

>>>  (i) that is materially false;

>>>  (ii) respecting the debtor's or an insider's financial condition;

>>>  (iii) on which the creditor to whom the debtor is liable for such money, property, services or credit reasonably relied; and

>>>  (iv) that the debtor caused to be made or published with the intent to deceive.

11 U.S.C. § 523(a)(2)(B).

However, an exception to discharge is to be strictly construed, and the creditor bears the burden of proving the exception. *Grogan v.* Garner, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed. 2d 755 (1991), Schweig *v. Hunter (In re Hunter)*, 780 F.2d 1577, 1579 (11th Cir. 1986), abrogated on other grounds. "[C]ourts generally construe the statutory exceptions to discharge in bankruptcy 'liberally in favor of the debtor,'" recognizing that the "'reasons for denying a discharge . . . must be real and substantial, not merely technical and conjectural.'" *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 304 (11th Cir. 1994)(citations omitted). Exceptions are construed strictly to give effect to the fresh start policy of the Bankruptcy Code. *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1164-64 (11th Cir. 1995). The creditor must prove each of the elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279 (1991).

Under § 523(a)(2)(B), the creditor must establish that it reasonably relied on the debtor's statement. Reasonable reliance is an objective test requiring conduct consistent with the standard of a reasonable man. "Reasonable reliance connotes the use of the standard of ordinary and average person." *City Bank & Trust Co. V. Vann (In re Vann)*, 67 F.3d 277, 280 (11th Cir. 1995). The Tenth Circuit has stated:

>  This standard of reasonableness places a measure of

responsibility upon a creditor to ensure that there exists some basis for relying upon the debtor's representations. Of course, the reasonableness of a creditor's reliance will be evaluated according to the particular facts and circumstances present in a given case.

*First Bank v. Mullet (In re Mullet)*, 817 F.2d 677, 679 (10th Cir. 1987), abrogated on other grounds, *Field v. Mans*, 516 U.S. 59 (1995). The Fifth Circuit has stated:

> The reasonableness of a creditor's reliance, in our view, should be judged in light of the totality of the circumstances. The bankruptcy court may consider, among other things: whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257, 261 (5th Cir. 1993).

Black's Law Dictionary defines "material" as "of such a nature that knowledge of the item would affect a person's decision making; significant; essential." *Black's Law Dictionary* (9th ed. 2009). A "material representation" is one "to which a reasonable person would attach importance in deciding his or her course of action in a transaction." *Id.* A "material fact" is one "that is significant or essential to the issue or matter at hand." *Id.*

The court now turns to applying this law to the relevant facts of this case. The first misrepresentation alleged by the plaintiff concerned the difference between Hiett's actual deposited funds and amount he listed on the personal financial statement. The financial statement overstated the actual amount on deposit by approximately $120,000. However, the loan committee did not rely on this representation when it approved the loan to Hiett. The loan officer would have still recommended the loan even if he had known the correct amounts deposited in each account. The two loan committee members both would have voted to approve the loan even if the two overstated accounts had not existed. In fact, Phillips would have voted to approve the loan based solely from Hiett's ongoing business relationship with First Bank. Therefore, First Bank did not rely on the amount of the stated

deposits when deciding to approve the loan. Because the misrepresentation was not relied upon, Hiett's overstatement of his deposited funds cannot lead to the debt being nondischargeable.

The second alleged misrepresentation concerned the accounts receivable listed on the personal financial statement. Although the plaintiff indicated that there were two accounts listed that were never collected, Hiett testified that the debts were owed to him, and that he felt they were collectible at that time. No contrary evidence was presented. Therefore, this representation has not been shown to be false and hence, cannot form the basis to hold the debt nondischargeable.

The third alleged misrepresentation concerned the omission of Hiett's interest in Classic Construction. This omission was the most significant misrepresentation made on the financial statement. The $1 million contingent liability had the potential to affect the bank's determination to approve the loan. However, the court is convinced that the bank did not actually rely on the financial statement when making the decision about the loan. At that time, the bank had a fast track approval method for commercial loans of this type. Phillips in particular would have approved the loan based solely upon Hiett's prior relationship with First Bank. The committee considered the personal financial statement to be generalized and understood that the situation could change. Additionally, First Bank had knowledge of Hiett's interest in Classic Construction based upon its guaranty of the loan. Therefore, since the personal financial statement was not relied upon by the committee when approving the loan application, even this significant misrepresentation does not form the basis for finding the debt nondischargeable.

The § 727(a)(2)(A) Count:

The plaintiff contends that Hiett should be denied a discharge of debts altogether as a result of his concealment and/or transfer of his property within one year of filing the bankruptcy petition with the intent to hinder, delay, or defraud plaintiff in its efforts to collect a prepetition judgment.

"To successfully object to a discharge under § 727(a)(2)(A), a creditor must establish (1) that the act complained of was done within one year prior to the date the petition was filed, (2) with the actual intent to hinder, delay, or defraud a creditor, (3) that the act was that of the debtor, and (4) that the act consisted [of] transferring, removing, destroying, or concealing any of the

debtor's property. *In re Coady*, 588 F.3d 1312, 1315 (11th Cir. 2009)(quoting *In re Jennings*, 533 F.3d 1333, 1339 (11th Cir. 2008). In an objection to discharge, the plaintiff has the burden to prove the objection by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 289-91, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

"To block a debtor's discharge pursuant to § 727(a)(2), a creditor is not required to adduce direct evidence of a debtor's bad intent." *In re Kane*, 755 R.3d 1285, 1296 (11th Cir. 2014). "Since it is unlikely that a debtor will admit that he intended to hinder, delay, or defraud his creditors, the debtor's intent may be established by circumstantial evidence of inferred from the debtor's course of conduct." *In re Jennings*, 533 F.3d 1333, 1338 (11th Cir. 2008).

Concealment:

The plaintiff alleges that Hiett concealed his assets by shielding the fruits of his labors from First Bank's efforts to collect its judgment. Hiett, First Bank contends, did so by taking no salary from Hiett Holdings or Hiet Automotive Alabama. Instead of maintaining a personal account into which his earnings could be deposited, Hiett used the Hiett Automotive Alabama and Hiett Holdings accounts to pay personal expenses. Neither Hiett nor Kelly Hiett has ever received a salary from either of the corporations.

When First Bank served Hiett Automotive Alabama with post-judgment garnishments of Hiett's earnings, Hiett responded that the corporate account was not holding any of his personal funds. Yet, Hiett used and continues to use that same account to defray all of his personal expenses. Hiett has concealed his earnings from First Bank by refusing a salary, shielding his income from judgment execution, and paying all of his expenses through the corporate accounts.

The court does not accept Hiett's testimony that he did not take a salary because he could not open a bank account in Alabama. Rather, the court is convinced that Hiett, who had experienced the sweeping of his accounts in Georgia banks, feared that the same would happen should he deposit salary into a personal account again. In short, Hiett's intent in refusing a salary and not establishing a personal bank account was to shield his earnings from the judgment creditor.

The facts here are strikingly similar to those in *In re Coady*, 588 F.3d 1312 (11th Cir. 2009). In *Coady*, the debtor, a real estate developer, found

himself $27 million in debt after an economic downturn.  *Id.* at 1314.  He later formed a corporation with his wife as the sole shareholder.  He worked in that company for years and never drew a salary.  All the while he paid his personal expenses out of the business accounts.  *Id.*  The Eleventh Circuit affirmed the decisions of the Bankruptcy Court and the District Court which denied the debtor a discharge.  *Id.* at 1315.

In *Coady*, the Eleventh Circuit rejected the debtor's assertion that "diverting the fruits of his labor to avoid acquiring assets was not a transfer or concealment under § 727(a)(2)."  *Id.*  Instead, it found that the debtor had an equitable interest in the companies because the debtor was the "sole person actually and actively involved" in the corporations and "whatever increase in equity [came] about in the future through [his] labor [would] be protected from his creditors, while being available for his benefit or to fulfill his legal obligations of support for his family." *Id.* at 1315-16 (alterations in the original) (internal quotation marks and citations omitted).

In this case, Hiett is the sole person actively managing and working in both Hiett Automotive Alabama and Hiett Holdings.  All of his personal expenses are paid out of the corporate accounts. But when the plaintiff attempted to reach the corporate accounts, it was told that no personal assets were being held by the companies.  He has never taken a salary from either corporation.  He has diverted the "fruits of his labor" into the two corporations and then used the business assets to support himself and his family all the while effectively shielding those assets from creditors.

Following the Eleventh Circuit's holding in *Coady*, the court finds that Hiett has concealed his personal assets with the intent to hinder the creditor.  Therefore, his discharge must be denied under 11 U.S.C. § 727(a)(2)(A).

Transfer:

The plaintiff has also alleged that Hiett transferred assets in order to hinder the plaintiff from collecting on the judgment.  Both of the Hietts testified that no assets of Hiett Automotive Georgia were transferred to Hiett Automotive Alabama.  This testimony is corroborated by both the 2009 corporate tax return and the Hietts' individual 2009 tax return.  No contradictory evidence was presented.

Several checks were written to Hiett personally and then deposited into the accounts of the two corporations.  Hiett presented credible

explanations for each of the checks presented.  The checks deposited into the Hiett Automotive Alabama account were down payments for vehicles. The checks that were deposited into the Hiett Holdings account were for sales of various types of merchandise belonging to Hiett Holdings.  No alternate explanation for these transfers was presented.  In short, there was no showing that the transfers made by Hiett to Hiett Automotive Alabama or to Hiett Holdings were not from proceeds of the sales of property belonging to the two corporations and not of Hiett's personal property.

For these reasons, the court finds that these transfers were not transfers of Hiett's personal assets within a year of the bankruptcy such that discharge should be denied.

Conclusion

For the foregoing reasons, judgment will enter in favor of the debtor on the plaintiff's § 523(a)(2)(B) count, but judgment will enter for the plaintiff under the § 727(a)(2)(A) (concealment) count.  By separate order, the debtor's discharge will be denied.

Done this the 30th day of September, 2014

/s/ Dwight H. Williams, Jr.
United States Bankruptcy Judge

c:      Joel Connally, Plaintiff's Attorney
        Charles M. Ingrum, Jr., Defendant's Attorney